NEW MEMPHIS GASLIGHT CO. CASES.

·(*Jackson.* June 26, 1900.)

1. DEED. *Execution of, by corporation valid, when.*

A deed binds a corporation, though not signed by the corporate name, where it purports on its face to be the deed of the corporation, recites in the *in testimonium* clause that the corporation has caused its corporate seal and the names of its president and secretary to be attached thereto, and which in fact bears the corporate seal, and is signed by its president and secretary in their official capacities. (*Post, pp. 278, 279.*)

Code construed: § 3679 (S.); § 2819 (M. & V.); § 2012 (T. & S.).

2. MORTGAGES AND DEEDS OF TRUST. *Reservation that does not vitiate.*

A mortgage or deed of trust is not vitiated by a stipulation or reservation that nothing therein contained shall prevent the maker, a gaslight company, from "using or expending its money and assets in extending its works, or from selling or exchanging, when deemed expedient for the increase and benefit of its business, its town lots, buildings, manufactories, and machinery, the security of the bonds not to be lessened thereby," where the money and other personal property of the maker is not embraced in the conveyance. "Assets," as here used, embraces only personalty. The power to sell or exchange realty, as here given, is a limited one, and could be made effectual only by consent and conveyance by the trustee and for the purpose of the trust. (*Post, pp. 279, 280.*)

Case cited: Frierson *v.* Blanton, 1 Bax., 272.

3. CONTRACTS. *Manner of construing.*

It is the duty of the Court to construe written contracts, if their meaning be in doubt, so as to give them effect rather than destroy them. (*Post, p. 280.*)

Cases cited: Morley *v.* Power, 10 Lea, 219; Frierson *v.* Blanton, 1 Bax., 272.

New Memphis Gaslight Co. Cases.

· 4. CORPORATIONS. *Innocent holder of corporate bonds.*

One who advances money to a corporation upon faith of its bonds deposited as collateral security, is a holder of such bonds for value in due course of trade, and entitled to protection as such. (*Post, pp. 281, 282.*)

5. SAME. *Same.*

One who is compelled as surety to pay the debt of a corporation, and thereafter takes the note of the corporation for the amount secured by deposit of its bonds, is holder of such bonds for value and in due course of trade, and entitled to protection as such. (*Post, p. 282.*)

Case cited: Atlanta Guano Co. *v.* Hunt, 100 Tenn., 89.

6. SAME. *Authority of directors to pledge bonds of, as collateral security for its debts.*

Directors are authorized not only to sell, but likewise to pledge the company's bonds as collateral security for existing indebtedness and future loans, where the bonds were issued under a resolution of the stockholders for the purpose of paying an existing floating indebtedness for improvements and to make others, and to retire an existing bond issue, the directors being authorized by the resolution to use the bonds for these purposes in such manner as they might, in their judgment and discretion, deem best. (*Post, pp. 282–284.*)

Cases cited: Baxter *v.* Washburn, 8 Lea, 15; Hunt & Bro. *v.* Gaslight Co., 95 Tenn., 136.

7. SAME. *Directors' right to vote.*

Directors of a corporation are not disqualified to vote to apply the bonds or other effects of the company to secure or pay its debts held by another corporation in which they are officers or interested, especially when they are acting pursuant to a resolution of the stockholders. (*Post, pp. 284, 285.*)

8. SAME. *Directors' right to secure themselves.*

Directors of a corporation are not forbidden, by reason of their position, to deal with the company, and where they have become indorsers for the accommodation of the company, they are permitted, while it is a going concern expecting to continue in business, to secure indemnity against possible loss from such indorsements. They may receive collateral security direct from the company, or may retain collaterals held by

the principal debtor upon their payment of the debt. (*Post,* *pp. 285–289.*)

9. SAME. *Directors' dealings with company scrutinized.*

But the Courts will closely scrutinize all transactions between a corporation and its directors, by which the latter take benefits. (*Post, p. 289.*)

10. SAME. *Not treated as insolvent, when.*

A corporation will not be declared insolvent and its property administered as a trust fund for its creditors, and its dispositions thereof set aside, where the bill that prays such relief in the alternative, avers, and the proof shows, that the assets of the corporation are largely in excess of its indebtedness, and that it was, and expected to continue, a going concern at the date of the transactions. (*Post, pp. 289–292.*)

Cases cited: Marr *v.* Bank, 4 Cold., 471; Moseby *v.* Williamson, 5 Heis., 278; Comfort *v.* McTeer, 7 Lea, 660; Tradesman's Pub. Co. *v.* Car Wheel Co., 95 Tenn., 634; McLaren *v.* Roller Mill Co., 95 Tenn., 696; Memphis, etc., Co. *v.* Ward, 99 Tenn., 172.

11. SAME. *Sale of corporate properties under mortgage not set aside, when.*

A fair, open, public sale of the corporate properties, made under and pursuant to the provisions of 'a mortgage, will not be set aside at the instance of creditors or stockholders, for the reason that directors of the corporation united with others in the purchase, where it appears that such directors were creditors and holders of bonds of the corporation, but did not procure or invite the sale, which was forced by other bondholders. (*Post, pp. 292–298.*)

12. SAME. *Same.*

The sale of the mortgaged property under the provisions of the mortgage and upon the facts set out in the opinion is held not to be premature, though made for the entire indebtedness upon default in payment of interest only. (*Post, pp. 298–301.*)

13. MECHANICS' LIEN. *Inferior to mortgage lien, when.*

The mechanics' lien is inferior to that of a mortgage where the materials for which the lien is asserted were furnished after registration of the mortgage and without notice to the mortgagee, though upon a contract made prior to the mortgage. (*Post, pp. 302, 303.*)

New Memphis Gaslight Co. Cases.

Cases cited: Baxter *v.* Washburn, 8 Lea, 15; Green *v.* Williams, 92 Tenn., 224; Electric Light Co. *v.* Gas Co., 99 Tenn., 387.

14. CROSS BILL. *Unnecessary, when.*

A cross bill is unnecessary and will be dismissed where the relief which it seeks can be as well obtained under the answer to the original bill. (*Post, p. 303.*)

15. ATTORNEY AT LAW. *Fees of.*

An attorney at law whose services have been rendered in defense of a suit in which no funds of his client have been brought under control of the Court, is not entitled to decree or lien for fees in the cause. (*Post, pp. 303, 304.*)

---

FROM SHELBY.

---

Appeal from Chancery Court of Shelby County. F. H. HEISKELL, Ch.

T. D. YOUNG, CARROLL, McKELLAB & BULLINGTON and TURLEY & TURLEY for Rawlins.

B. W. HIRSH, W. W. McDOWELL, T. K. RIDDICK, SCRUGGS & ROSEBOROUGH and METCALF & METCALF for Gaslight Co.

BEARD, J. The Memphis Gaslight Company was a corporation organized under the laws of this State for the purpose of manufacturing and furnishing gas to the city and citizens of Memphis.

On the first day of April, 1873, a trust deed

conveying all of its property, rights, and franchises was made by the corporation to S. P. Read, as trustee, to secure the payment of $240,000 of its bonds, payable to bearer in the city of New York, each bond having attached interest coupons falling due semiannually; these bonds are still outstanding. For many years. the company was very successful, paying large dividends to its stockholders, in addition to meeting the interest on its bonds, but in the course of time another gas company was organized in Memphis, and a fierce competition for patronage at once ensued. In order to compete with its rival, equipped with modern economic appliances, as well as to replace with new machinery that which from the wear and tear of years had degenerated, in 1891 and the early part of 1892, the Memphis Gaslight Company found it necessary to expend large sums of money for betterments. In making these a floating debt of about $135,000 was created, and yet it became apparent to all interested in the company that all needed improvements were not made, and to complete these at least $25,000 more would be required. This debt already existing taxed the credit of the company, and was a burden upon some of its directors, who had loaned their names to give additional strength to the paper of the corporation issued by it to carry on these improvements. In view of this condition the stockholders convened, according to a call properly made.

on the thirtieth of June, 1892, when it was by them resolved to issue new coupon bonds of the company to the amount of $400,000, to run for thirty years, secured by a mortgage on all the property of the company. All the details of the making and the issuance of these bonds to be left to the discretion of its board of directors. At a meeting of the board on the eighth of July, 1892, in pursuance of the authority thus conferred, it was resolved that there should be issued 400 bonds of the denomination of $1,000 each, to be dated July 1, 1892, payable to bearer, in gold coin of the United States of standard fineness, thirty years after date, bearing interest at six per centum per annum, with coupons for such interest attached payable July 1 and January 1 of each successive year, and to secure these that a trust deed conveying all of the franchises and property of the company should be executed to the Manhattan Savings Bank and Trust Company, of Memphis, as trustee; and that the trust deed should provide for foreclosure upon default in the payment of interest.

At a meeting of the board on the thirtieth of July, 1892, it was resolved that of this issue of bonds only $160,000 should be immediately used, and a committee was appointed to set forth the needs of the company and to urge upon its stockholders to come to its aid by purchasing these

21 P—18

bonds; the balance of the issue ($240,000) was to remain under the control of the company, to be used alone in retiring those secured by the trust deed of 1872.

The effort to sell the $160,000 of the bonds failed, save to a limited amount, so under the authority of the board of directors those not sold were used as collateral security for the paper of the company, which, as before stated, had been used to raise money for betterments. On some of this paper Napoleon Hill, T. R. Riddick, J. W. Bailey, R. D. Frayser, and N. M. Jones, directors of the company, were accommodation indorsers, and a part was outstanding without indorsers or other security.

The notes indorsed by Hill, Riddick, and Bailey at maturity were taken up by them, and they received from the holder the bonds which had been pledged by the company for their security, or else, each taking a note for the amount of his payment from the company, at the same time received bonds as collateral. In this way Hill, on the payment of $5,000, received $6,000 in amount of bonds, and Riddick and Bailey each received $3,000 par value of bonds for a payment of $3,000 made by them respectively. These parties, as did others holding the notes of the company thus secured, in pursuance of power given in these notes, upon their maturity and nonpay-

ment, sold the bonds, and in each case the holder became the purchaser.

Disappointed in various efforts to relieve itself, the company finally defaulted in the payment of the interest on these bonds, and upon a demand made by some of the holders, the trustee named in the second trust deed took possession of all the properties of the company, and, after due advertisement, made public sale of the same. At this sale the holders of these bonds became the purchasers at the sum of $125,000. Among these purchasers were Hill, Riddick, and Bailey. Soon after their purchase, the parties buying having received a deed from the trustee, organized the New Memphis Gaslight Company, and there was transferred to it all the properties so acquired by them.

These transactions are impeached in the several consolidated suits entitled above. The bill of Mary Rawlings is that of a stockholder of the Memphis Gaslight Company, and has for its object a cancellation of the two deeds of trust executed by that company hereinbefore mentioned, as well as the deed from the trustee, the Manhattan Savings Bank and Trust Company, to the purchasers at the trustee's sale, and the conveyance afterward made by which the property passed to the New Memphis Gaslight Company. Hunt Bros. and Miss Anne Pritchard, executrix, judgment creditors of the Memphis Gaslight Company, filed their

respective bills in the Chancery Court of Shelby
against the same, or many of the same, defend-
ants, as those to the bill of Mary Rawlings,
seeking relief against these same conveyances on
much the same grounds as are alleged in that
bill. The bills of the Laclede Fire Brick Manu-
facturing Company and of the Christopher Simp-
son Architectual Iron Works, were filed to enforce
mechanics and materialmen's liens for work and
labor done and machinery furnished to the Mem-
phis Gaslight Company on contracts made with
it before the foreclosure sale already referred to,
and, as does the Rawlings bill, they assail the
various conveyances and transactions hereinbefore
set out, and assert liens in favor of the respec-
tive claimants on the property of that company.

The bill of Mary Rawlings was amended so as
to make more specific its various charges. In
this amendment it is averred that the first mort-
gage was void because it was not signed by the
Memphis Gaslight Company nor sealed with its
seal, and, further, because the company had no
power, under its charter, to execute the mortgage.
It was also averred that the bonds secured by this
mortgage were void, because they were used to
purchase the property, rights, privileges, and fran-
chises of a competing gas company, and, further,
because the bonds were tainted with usury, hav-
ing been made payable in New York for the

New Memphis Gaslight Co. Cases.

purpose of avoiding the usury laws of the State of Tennessee.

Again, it was averred "that said second mortgage is void for the reason that (1) said Memphis Gaslight Company had no power, under its charter, to execute same; (2) because said bonds, contrary to law, and contrary to any authority in said officers to execute the same, provide for their payment in gold coin of the United States of the then weight and fineness of the same; (3) because said company undertakes to and does mortgage its right and franchise to exist as a corporation; and (4) because it mortgages or undertakes to mortgage its income."

Continuing, the bill alleges "that said sale under said second mortgage is void (1) because said mortgage and bonds were and are void for reasons hereinabove stated; (2) because the description of said property in said mortgage, and of said indebtedness, is not good in law; (3) because said pretended sale was not properly advertized, and was premature under the terms and provisions of said trust deed; (4) because, further, no proper demand was made on the trustee to foreclose; (5) because said trustee making said sale was the holder of a portion of said bonds for the payment of which said sale was pretendedly made; (6) because said mortgage and bonds were void, having been executed by said Memphis Gaslight Company in the course of its business, when it

had not paid its privilege taxes; (7) because the pretended debts of the purchasers at the trustee's sale were created at a time, if at all, when these purchasers had not paid their privilege taxes; (8) because the said purchasers were the stockholders, directors, and officers of said company; and (9) because said sale was the result of a combination and of bad faith on the part of the parties interested in acquiring said property at a reduced price, and depriving the holders of the Memphis Gaslight Company of the same; and (10) because fraudulent in fact and in law."

We will dispose of the controversies raised in and common to all these causes, leaving the distinctive features of the several cases for determination at the last.

It is argued that the deed of trust to Read, trustee, is inoperative, because it was not executed by the Memphis Gaslight Company, but was the act and deed of its officers. This instrument upon its face purports to be the deed of the company, but it is signed "Enoch Ensley, President," and countersigned "Geo. W. Gift, Secretary;" it, however, has the seal of the corporation attached. While thus signed, following the conveying terms of the deed the clause *in testimonium* is as follows: "In witness whereof, the said Memphis Gaslight Company has caused its corporate seal to be attached hereto, and caused this deed to be signed by Enoch Ensley, its president, and to be

countersigned by Geo. W. Gift, its secretary, and it is also signed by S. P. Read, the trustee. This the first day of April, 1873."

This instrument meets the common law requirement, inasmuch as it is authenticated by having affixed to it the corporate seal, and also the requirement of the statute of 1841-42, Sec. 1, carried into the (Shannon's) Code at § 3679, which is in these words: "Instruments in relation to real or personal property, executed by an agent or attorney, may be signed by such agent or attorney for his principal, or by writing the name of the principal by him as agent or attorney, or by simply writing his own name or his principal's name, if the instrument on its face shows the character in which it is intended to be executed."

Again, it is urged this deed of trust is void because of the following clause:

"But it is hereby expressly stipulated and expressed that nothing herein shall operate to prevent the party of the first part from using or expending its money and assets in extending its forks or from selling or exchanging, when deemed expedient for the increase and benefit of its business, its town lots, buildings, manufactories, and machinery, the security of the bonds not to be lessened thereby."

The insistence is that this is, in effect, a reservation of such power of control and disposition of the property conveyed as to render nugatory

the security of the instrument. The trust deed does not include the money of the gas company, and there is, therefore, no inconsistency in the mortgagor reserving the right to expend it in extending its work. Nor is the instrument any more affected by the addition of the words "and assets," as it is evident the draftsman had in his mind personal assets of a kindred nature with "money;" however, no personal property is embraced in its conveying clause. Thus the only question is, Does the reserved right to the mortgagor of selling or exchanging the property covered by the conveyance when "deemed expedient," vitiate the instrument. We think this question is answered by the case of *Frierson* v. *Blanton,* 1 Bax., 272. This power to sell or exchange during the running of the mortgage did not involve the power to convey, that was alone in the trustee, and this could only be done by him when the security of the bonds protected by the mortgage was not lessened. So, at the last, the power of control was left with him, and not with the mortgagor. This construction of the instrument is natural, and in giving it we are only recognizing the well-settled rule that it is the duty of the Courts to construe instruments so as to give them operative effect rather than to destroy them. *Morley* v. *Power,* 10 Lea, 219; *Frierson* v. *Blanton,* supra. We therefore think there is nothing in this contention.

As to the averments in the bill that the bonds secured by the Read mortgage were void, because *ultra vires*, in that they were issued to buy up a competing gas plant, and that they were made payable in New York in order to avoid the usury laws of this State, there is no evidence to support either, and they may be dismissed from further consideration.

We come now to a discussion of the trust deed to the Manhattan Trust and Banking Company, and the various steps taken prior and subsequent to its foreclosure, all of which are made subjects of serious attack *by the complainants in their several bills.

. We do not understand any question is made upon the power of the company to execute this instrument, or as to the formality of its execution; rather the controversy is over the disposition of certain of the bonds secured by it, and the foreclosure sale made under it with the incidents both preceding and subsequent to the sale.

In the first place, it is said that of the bonds secured by this deed only nineteen fell into the hands of *bona fide* holders. This is a mistake of fact and of law. It is true only that number were sold by the corporation, but the remaining $141,000 of the $160,000 were used by it to secure loans made to the company at the time of and on the faith of their pledge, or else to secure pre-existing debts either upon renewal or

otherwise. The Continental National Bank and the Memphis City Bank each advanced money to the company upon the security of these bonds. These banks, no less than the purchasers of the nineteen bonds, were, on this record as to these bonds, holders for value in due course of trade, in the strictest sense. This is also true as to Riddick. He was one of the indorsers of the company's note for $10,000 made to the First National Bank. Being unwilling to renew the paper, the bank agreed to discharge him, and did do so, on his paying $3,000 on this note. Thereupon the company executed to him its note for that sum, and pledged three bonds of $1,000 each as collateral. This made him a *bona fide* holder for value within the ruling of *Atlanta Guano Co.* v. *Hunt,* 100 Tenn., 89. While it is true the parties taking bonds as collateral security for pre-existing debts, under the rule then prevailing in this State, were not holders for value in due course of trade, yet it being clear that the debts they were given to secure were honest debts of the company, created by it in making the very improvements the bonds were issued to pay for, the creditors receiving them as security were *bona fide* holders, and as such entitled to full protection save as against such equities as might be inherent in the bonds.

But it is said the directors of the company had no power other than to sell these bonds after issuance, and that the act of pledging was there

fore *ultra vires* and void. This assumption is unwarranted in fact. The stockholders' meeting of June 30, 1892, authorized the issuance of these bonds to the amount of $400,000, and the execution of a mortgage to secure them, in view of a floating debt of about $135,000 contracted for extensions and improvements already made, and about $25,000 of improvements still required, and of the approaching maturity of the $240,000 bonds covered by the Read mortgage. This meeting, by special resolution, approved the improvements made and contemplated, and also the retiring of the Read bonds, but did not direct the sale off the new bonds for any purpose. On the contrary, it resolved "that when said bonds shall be ready for use . . . they shall be subject to the control of the board of directors of this company, to be used by said board in its discretion and judgment for the purposes in these resolutions specified."·

At a meeting of the board on the thirtieth of July following, it was determined that of this issue of new bonds $240,000 should be placed in the custody of the Manhattan Savings Bank and Trust Company subject to the further order of the board, and that the president of the company should use the remaining $160,000 of bonds as collateral security for moneys advanced or to be advanced to the company by the First National Bank, or to protect the indorsers of the paper of the company made for such advancements. At

the same meeting a committee was appointed to effectuate a sale, if possible, of these bonds at par. At the time of the passage of this resolution the only indorsers of the company's paper were four of its directors, to wit, Jones, Riddick, Bailey, and Hill, and it is evident this action contemplated security for them as well as for the holders of the paper. But we think the assumption equally unsound in law. The act of pledging the bonds to secure an advance of moneys for the use of the company, as in cases of the Continental National Bank and Memphis City Bank, or to quiet its pre-existing creditors, or to secure its accommodation indorsers, was not an act *ultra vires*. *Baxter* v. *Washburn*, 8 Lea, 15; *Hunt & Bro.* v. *Gaslight Company*, 95 Tenn., 136.

But it is said that the directors were disqualified from voting to apply bonds to secure debts upon which they were liable, or which were held by corporations in which they were interested. At the meeting of the board in July, when the disposition of these bonds was decided, there were present and voting five directors, to wit, Jones, Hill, Frayser, Bailey, and Nathan. Of these Jones was president of the First National Bank, which then held a large amount of the paper of the company, and Nathan was cashier of the Manhattan Savings and Trust Company, which was also a creditor, and all were indorsers of notes given by the company.

It is to be remembered that the stockholders, at their meeting on the thirtieth of June, 1892, were advised fully of the floating debt of the corporation, and the necessity of adding at least $25,000 to it, in order to make other improvements, and voted the issue of new bonds primarily to provide for this debt and these further needed improvements, but instead of directing a sale of the excess of these bonds over $240,000, placed them under the control of the board of directors, to be used by them as in their judgment might seem best. Clothed with this broad power it would require a case at least of more than an exercise of mistaken discretion in their disposition to impeach their action.

In addition we are aware of no principle, and certainly our attention has been called to no authority, which precludes a director of one corporation from voting or otherwise seeking in a legitimate way security for an honest debt due from that corporation to another of which he happens to be an officer.

Again, it is well settled that a director is not forbidden, by reason of his position, from dealing with the corporation, and it often serves a wise purpose that he should lend it his personal credit in carrying on its operations. This being so, why should he not be permitted, from a going concern continuing and expecting to continue business, to

secure indemnity against possible loss from accommodation indorsements he has made for it?

In *Sanford Fork and Tool Co.* v. *Howe, Brown & Co.,* 157 U. S., 312, a mortgage was made by a corporation, a going concern, then engaged and in good faith expecting to continue in business, to secure its directors as accommodation indorsers of its paper. In answer to the argument that these parties were directors, and had no right to secure themselves, the Court, speaking through Brewer, J., said:

"For here the corporation, although insolvent within the rule which declares that insolvency exists when the debtor has not property sufficient to pay his debts, was still a going concern, and intended to continue its business, and the mortgage was executed not simply to secure directors and stockholders for past indebtedness, but to induce them to procure a renewal or extension of the paper of the company then maturing, or about to mature, and also to obtain further advances of credit.

"Will it be doubted that if this mortgage had been given directly to the holders of these notes, it would have been valid? Are creditors who are neither directors or stockholders, but strangers to a corporation, disabled from taking security from the corporation by reason of the fact that upon the paper they hold there is also the indorsement of certain of the directors or stockholders? Must,

as a matter of law, such creditors be content to share equally with other creditors of the corporation because, forsooth, they have also the guarantee of some of the directors or stockholders, whose guarantee may or may not be worth anything?"

It is to be observed in the present case the bonds were not pledged originally to those directors, but to the First National Bank, which had advanced to the corporation large sums of money upon its notes, upon a portion of which they were indorsers. As has been stated, this money, as well as that secured from other sources hereinbefore indicated, was used to pay for improvements conceded by the stockholders to be essential to the proper operation of the company. These parties pledging their individual credit, in order to strengthen that of the corporation, were under no obligation to do so. They derived no benefit from the expenditures and improvements thus made that was not common to all stockholders alike. It is, we think, clear on this record that when they indorsed this paper, as well as when they voted authority to pledge the bonds as security, they honestly believed, and had the right to believe, that they were pursuing a policy likely to accomplish the best results for the company.

It is true that the resolution of the board was that the president of the company should pledge the bonds to secure the payment of its paper or

to protect the indorsers, and that twelve of the bonds passed ultimately into the hands of those indorsers, to wit, six to Napoleon Hill, and three each to Riddick and Bailey, on account of payments made by them as such indorsers. It, however, is immaterial whether they came by them upon a pledge made direct by the company or from the bank, which, upon receiving payment of the notes they were on, turned over to them its collaterals. They were entitled to them if the transaction from which they came will bear the scrutiny of the Court.

In *Dunscomb* v. *Railroad Co.,* reported in 84 N. Y., 190, and upon a second appeal in 88 N. Y., 1, referred to approvingly in *Hunt & Bro.* v *New Memphis Gaslight Co.,* supra, it was held a pledge of bonds was valid when ordered by the executive committee of the directory, which committee was composed of three persons, one being the pledgee, and the two others indorsers on some of the paper which the bonds were pledged to secure. Upon this state of facts the Court said:

"The claim that Rucker acquired no title to the bonds for the reason that he obtained them by the votes of two of the directors while they were personally liable as guarantors for a part of the obligation for which security was given, we think cannot be upheld. The debt was due to Rucker by the company, and the money was not advanced or loaned to Meade and Dunscomb, and

their guaranty was that of individuals, and not as officers of the company. They were under no personal obligation originally to pay the debt, and no reason is apparent why they were not justified in placing the matter in a position where the company should pay its debt and relieve them." See, also, *Foster* v. *Belcher's Sugar Refining Co.,* 118 Mo., 238.

It is true all such transactions will invite the closest investigation by the Courts, if brought in question, and must be shown to be characterized by the utmost good faith (3 Thompson on Corp., Sec. 4059; *Addison, etc.,* v. *Lewis,* 75 Va., 701), but when found to be free from all suspicion of unfairness, they will be maintained. There are cases to the contrary, but we think the weight of authority, as well as considerations of policy, sustain such a transaction. *Gould* v. *Railroad,* 52 Fed. Rep., 685; *Rockford Grocery Co.,* 175 Ill., 89; *Brown* v. *Grand Rapids Par. Fire Co.,* 58 Fed. Rep.

It is again urged against these pledges of bonds that they were made at a time when the insolvency of the corporation had converted its assets into a trust fund for the payment of all creditors. This objection is made outside the pleadings. In the bills of Pritchett, Christopher & Simpson, and Hunt Bros. the insolvency of the corporation at the time of the pledges is not al-

21 P—19

luded to. In the bill of the Laclede Brick Company the charge is that at the time of the execution of the second mortgage the property conveyed was worth $800,000, and that, upon a pretended default in the payment of interest on the bonds secured by that mortgage, through the machinations of their holders, it was foreclosed, and the purchasers were enabled to get property worth at least $640,000 free from burden, for the sum of $125,000, thus negativing the idea of insolvency. This leaves the Rawlings bill for examination on this point.

It places a still higher valuation on the company's property. In paragraph 23 of the amended bill we find this charge:

"The said property so sold at said sale as aforesaid" (referring to the trustee's sale of April 2, 1894) "was at that time, and is now, worth more than $1,000,000, and was bid off at a totally inadequate price, and upon this ground, if upon no other, the said sale should be set aside."

In paragraph 56 complainant charges:

"Your oratrix further shows to the Honorable Court that in the fall of 1892 the property account of the Memphis Gaslight Company, made up, approved, and published by said officers, fixed the total value of its taxable property at $788,256.88, saying nothing of the rights, privileges, and franchises from and in the city of Memphis, a city of more than 75,000 population, worth at least

$75,000. Your oratrix further shows to this Honorable Court that after the making of said property account there was $150,000 expended in improvements, betterments, and extensions of its property, etc., making said property worth at the time it was pretendedly sold for $125,000 not less than $1,000,000."

Again, in paragraph 88 of the amended bill is found the following equivocal statements:

"Oratrix further shows to the Honorable Court that if said Memphis Gaslight Company was insolvent at the time said bonds were hypothecated to secure said pre-existing debts . . . of which she is not sufficiently advised to speak one way or the other," etc., and also in paragraph 96 this language: "Oratrix further shows that . . . if it be determined . . . that said company is insolvent, then this bill should be declared a general creditor's bill,' etc.

The only approach to an averment of insolvency of the corporation at the time of the pledges is found in the prayer where the Court is asked to declare the hypothecation of the bonds illegal on many grounds, and among others this: "Because said company had no power to preferentially secure said debts, if valid and just, to the exclusion of other creditors or stockholders, at a time when said Memphis Gaslight Company was insolvent."

It will be seen this last statement is a con-

clusion of law rather than an affirmation of a fact. On such pleadings we think defendants would have been relieved of entering upon proof as to the condition of the corporation at the time of these pledges, save as it might bear on the question of the good faith of its then officers and managers. But such evidence is in the record, and abundantly sustains the contention of defendants that the company was solvent at the time of the issue and pledge of these bonds, and was then and would have continued a going concern but for untoward circumstances over which the directors had no control. This being so, there is no room for the application of the trust fund doctrine announced in *Morrow* v. *Bank,* 4 Cold., 471; *Moseby* v. *Williamson,* 5 Heis., 278; *Comfort* v. *McTeer,* 7 Lea, 660; *Tradesman Pub. Co.* v. *Car Wheel Co.,* 95 Tenn., 634; *McLaren* v. *Roller Mill Co., Id.,* 696; *Memphis Barrel, etc., Co.* v. *Ward,* 99 Tenn., 172.

But it is said the directors, who were on certain of the paper of the company, co-operating with one or two favored stockholders, deliberately brought about the foreclosure of the secured mortgage, when, joining with others, they purchased the valuable property of the corporation for a trifle.

This objection leads to a consideration of the history of the corporation from the time of the determination of the stockholders to issue a new

series of bonds until, for the default in the payment of interest, the foreclosure sale took place.

As has already been stated, the new bonds were authorized, in part, if possible, to retire an earlier series, and more than all else to provide means to discharge a large floating debt created for betterments already made, and to pay for others that were required. This was in the summer of 1892. At that time a large part of this debt was carried by the First National Bank of Memphis in the shape of notes executed by the gas company. One of these notes for $10,000 had on it as accommodation indorsers Jones, Riddick, Bailey, and Nathan; one for $5,000 was indorsed by Napoleon Hill and another for the same amount by R. D. Frayser. The balance of the paper, amounting to about $50,000, was unindorsed. The entire debt, secured and unsecured, amounted to about $135,000. It was supposed at the time the bonds were authorized, that there would be no difficulty in selling $160,000 of the issue. While it is evident the business of the company had been interfered with by the competition of a rival gas company, yet the parties interested believed with the introduction, as had been done, of modern appliances for the making and distribution of gas, the corporation was in a condition to furnish it in a satisfactory manner to its customers, and profitably to itself. We are satisfied at that time there was not in the minds of the directors either

anticipation of insolvency or of a cessation of business. The committee appointed to dispose of these bonds, however, in 1892, had reported the highest price then obtainable for them was ninety cents. This offer was declined, as they were considered worth par. Afterwards, in 1893, one Underwood, an agent of certain eastern capitalists, appeared at Memphis, and, after a careful examination, made a proposition to purchase both gas companies in that city; this offer was acceptable to the stockholders of the Memphis Gaslight Company residing in Memphis, but was not so to those in Nashville, and therefore came to naught.

In the early part of the spring of 1893 the country began to feel the first shock of the financial panic of that year. This reached its crisis in the summer or fall of 1893. So widespread and disastrous was this that it prostrated business enterprises which until then were regarded as most stable, destroyed or reduced values, and created such general distrust that the very best securities often failed to draw money from its hiding places. It was in the midst of this panic that the First National Bank, holding the notes of the company secured alone by its bonds, called for their payment. Failing in this demand, the bank sold the bonds held by it as collateral under the authority given in their notes, and bought them in at the sale. In addition, in the cases of Hill and Bailey, they were required to take up the notes that they

were indorsers on, and when they did this the bonds pledged by the company as security were turned over to them. Riddick had already relieved himself by a payment from the note he had indorsed. The company, unable to reimburse these gentlemen, gave to them notes for the sums thus paid, secured by these bonds. Afterwards, by sales properly made, these three parties who had loaned their credit to the company, became the owners of the bonds pledged for their security.

At this time it became evident the company, if not *in extremis,* was rapidly approaching that condition. Several efforts had from time to time been made to avert the final catastrophe. It had before this been determined, if possible, to distribute the burden of carrying the $165,000 bonds among all the stockholders. This was after an abortive attempt to sell in the open market. The Memphis parties, including those whose good faith is fiercely assailed in these suits, believing the investment safe, but the disposition of the bonds essential, agreed to apportion among themselves $110,000 of these bonds at par. Large blocks of the Memphis Gaslight Company stock were held in Nashville, and the holders of this stock were urged, but declined, to take the remaining $50,000. One of the directors, to wit, Mr. Riddick, made a special trip to Nashville, and in personal interviews urged upon those stockholders the propriety and necessity of their taking their due proportion

of bonds, and thus aiding in tiding the company over to a more prosperous season. In addition, under the order of the board of directors, a circular letter, giving a detailed account of the condition of the corporation had been sent to the stockholders, and each was asked to come to its relief by becoming a purchaser of one or more of these bonds. We are satisfied that all were advised that unless such aid was given that those who had sustained the company up to that time, through the disastrous financial panic of 1893, would give up further endeavor and abandon the property to its fate under the second mortgage. Failing to secure relief, this was accordingly done, and then it was, under a written demand made by certain of the bondholders upon the trustee, it took possession of the property preliminary to a foreclosure of the mortgage. The bondholders making this demand, and the amount of bonds held by each, is set out as follows:

| | |
|---|---:|
| First National Bank | $ 67,000 |
| Pittsburg Coal Company | 21,000 |
| W. H. Brown & Sons | 8,000 |
| German Bank of Memphis | 9,000 |
| The Continental Bank | 18,000 |
| Memphis City Bank | 7,000 |
| Total | $130,000 |

It will thus be seen that neither Nathan, Hill, Riddick, nor Bailey joined in this demand, nor

are we able to discover that they stimulated it, or in any way confederated with others with a view to bringing it about, in order that they might share in any ultimate benefits resulting from the sale. The record, after a critical examination, fails to disclose on their part any evidence of bad faith, either towards creditors or stockholders, but, on the other hand, does show, as we think, an earnest and persistent effort to save the company from wreckage.

It is true its property was sold by the trustee to the purchasers at the sum of $125,000, and that Hill, Riddick, and Bailey were three of these purchasers, the holders of the other bonds constituting the remainder. But this sale was a public one, made after due advertisement, without any attempt, so far as we can see, to stifle biddings, and the property was still subject to the Read mortgage for $240,000. In addition, the sale took place in the early part of 1894, before the country had felt the first movement of financial recovery, and when capital was still unwilling to seek investment.

It is further worthy of note, as going to the good faith of the purchasers, that having transferred the property so acquired to the New Memphis Gaslight Company it operated the plant for almost eighteen months, and then closed it out to the rival company for one hundred and eighty thousand dollars, subject to the Read mortgage.

The only one of the three directors participating in the purchase at the trustee's sale, and afterwards in the proceeds of this sale, who is a defendant to the Rawlings bill, is Mr. Bailey, and the record shows that in December, 1395, out of the proceeds he received only the sum of $3,375 for the payment of $3,000 made by him for the company prior to September, 1893.

Again, it is said there was no default in the payment of the interest on these bonds, and on that account the trustee's sale was unauthorized.

The language in the third section of this Manhattan mortgage, authorizing the trustee to declare the bonds matured in the event of default in the payment of interest, reads thus:

"In case the party of the first part, its successors or assigns, shall fail to pay the installments of the semiannual interest on any of the said bonds, when the same may become due and payable according to the tenor thereof, or any coupon attached thereto, and shall continue in such default for sixty days after such installments have been demanded at the office of the party of the first part, or the National Park Bank, of New York, . . . then and thereupon the principal of all the outstanding bonds hereby intended to be secured shall, at the option of the trustee, become and be immediately due and payable, provided the trustee gives written notice to the party of the first part, its successors or assigns, while such de-

fault continues, of his option to that effect, which notice the trustee may give of his own motion if he sees fit, and shall be bound to give, if requested, in writing by the holder or holders of $100,000 in amount of all the bonds outstanding."

The record shows that none of the coupons on these bonds maturing January, 1893, except on ten bonds owned by one Williamson, were paid, and none of the July coupons without exception. Omitting the bonds pledged as collaterals and afterward sold, there were at least nine of the bonds which had been sold by the company for cash, on which there was a default for the January, 1893, coupons, and upon the whole nineteen for the July coupons, and there was no reason why, upon this default, if there had been no other, the trustee should not have exercised his option and declared the whole issue of bonds due and payable.

But that demand was made on the company at its office for the payment of the due coupons largely in excess of these nineteen, is shown by uncontroverted evidence. The default and demand are shown with equal clearness. It is unnecessary to set it out in detail; it is to be found in the testimony of the company's officers, as well as of those who made the demand.

By the clause set out above, the default began with the failure to pay the coupons when mature,

but the right to declare the whole issue due and payable did not accrue unless this default continued for sixty days after the demand. The testimony is uncontradicted that on October 3, 1893, a number of the holders of these bonds made demand for the payment of their due coupons, and that on December 4, 1893, upon the request, in writing, of the holders of more than $100,000 in amount of the bonds, the trustee gave written notice to the company that it declared all the bonds secured by the second mortgage due and payable, and thereupon took possession of its property, and after due advertisement made a public sale of it, as hereinbefore is set out.

But it is said that if the trustee had not diverted the income of the plant, while in its possession, to the payment of the coupons maturing on the first. or Read mortgage, there would have been no occasion for a sale under the second mortgage. The payment of these coupons was proper; the Read mortgage was prior in point of time and right, and the trustee, to save possession to itself and its successor in title, was obliged to pay these coupons. It is also insisted that the record, independent of this payment, shows that the trustee received a sufficiency of income while in possession which, if properly appropriated, would have averted the foreclosure sale. We have examined the record on this point, and it must

suffice for us to say we do not agree with appellants in their contention.

It is also said that the three directors, who had acquired the bonds of the company by reason of their accommodation indorsement of its paper, had no right to purchase at the trustee's sale. On this point there is some conflict of authority, but when it is once determined that a director may lend his credit in good faith to the corporation to enable it to carry on its legitimate business, and take as indemnity to secure himself from personal loss, its bonds, it seems to follow, necessarily, that he acquires the right, as any other mortgagee, to protect himself even to the extent of being a purchaser at a foreclosure sale, which has become inevitable through no fault or design of his. *Twin Lick Oil Co.* v. *Marbury,* 91 U. S., 587; *Saltmarsh* v. *Spalding,* 147 Mass., 224. But should it be conceded that we are wrong in this conclusion, yet, it would not avail complainants, because in the absence of evidence of a conspiracy to wrongfully bring about the sale between these directors and their co-purchasers, who sustained no fiduciary relations either to the stockholders or the creditors of the corporation, and who, so far as we can see, acted in good faith, the title acquired at the foreclosure sale could not be avoided. In such case the rule laid down in *Jackson* v. *Ludling,* 21 Wall., 616, does not apply. The most that complainants could obtain

would be to hold these directors liable for the profits derived by them from the ultimate sale of the property; but their bills are not framed on this theory, nor do they ask such relief. In addition, Hill and Riddick are not made defendants to the only bill (that of Mrs. Rawlings) under which, even upon proper amendments, such relief was possible.

This disposes of the main contentions raised by the Rawlings bill, but more or less cognate to all the bills. There remains, however, of the consolidated causes the mechanics' lien cases, and the only distinct question presented by them is, Are their liens superior to the rights of the purchasers under the mortgage? The contract of the Laclede Fire Brick Company antedated the mortgage, but no material was delivered until after the registration of the mortgage. The rule is, the title of the purchaser relates back to the time the mortgage became effectual (*Baxter* v. *Washburn,* supra; 5 Thomp. Corp., Secs. 6257, 6258), while the lien of the materialman begins when his first material is placed on the property, on which the lien is asserted. *Electric Light Co.* v. *Gas Co.,* 99 Tenn., 387; *Green* v. *Williams,* 92 Tenn., 224.

The contract of the Christopher Simpson Architectural Works was made and the materials furnished after the registration of the mortgage. In both cases the contract was made with the mort-

gagor, and no notice of it was given to the mortgagee.

After a careful examination of these voluminous records we are satisfied the Chancellor reached a right conclusion in the dismissal of these bills.

There remains open only one question, and that is made on the appeal of Read, trustee. He was made a party defendant to all these bills, and in each one the deed of trust in which he was named trustee was assailed. He answered the bills denying the averments made against this deed. He also filed a cross bill asking that the trust deed be declared a valid security for the payment of the bonds secured therein. This cross bill was dismissed, and he complains of this as error.

We think the cross bill was properly dismissed. It was not filed as a bill *quia timet,* and there was no occasion for its being so filed. The only parties questioning the integrity of this instrument were the respective complainants filing these bills, and a complete vindication of it could be obtained by their dismissal on answer and proof. A decree on the cross bill would have bound none others than the parties to the suit, and it would be *res adjudicata* as to them on the pleadings as they were. This also disposes of the application of his learned solicitor to have a lien declared for compensation for his professional services rendered the trustee. That the trustee was under legal obligation to protect this trust deed, assailed

New Memphis Gaslight Co. Cases.

as it was, and that he was authorized to employ a lawyer to this end, we think clear; and that the gentleman so engaged has rendered valuable service to his client is equally clear. But the fixing of the fee, and the security for its payment, must be between the two. There is no fund under the control of the Court upon which it could fix a lien, and no adverse parties against whom a decree in his favor could be rendered. To grant a lien or determine the amount due for the solicitor's service in these cases would be *brutum fulmen.* We have examined, as far as they have been available to us, the authorities relied on for this application, but none in our opinion support it.

The decree of the Chancellor is in all things affirmed. The costs of the lower Court are left as adjudged by him; the costs of the appeal will be paid by the complainants in these several causes and S. P. Read, trustee.