# HARLE-HAAS DRUG COMPANY v. ROGERS DRUG COMPANY ET AL.

## (No. 627.)

Corporations—Mortgages—Validity—Trust Fund Doctrine—When Applicable—Mortgage to Director—Validity—Insolvency—What Constitutes—Chattel Mortgages—Purchaser in Good Faith.

1. In a contest relating to the proceeds of mortgaged property of a corporation in the hands of a receiver, *held*, upon the evidence stated, that when the mortgages were executed by the corporation a·suspension of its business was not contemplated, and that they were to be considered as given by a corporation which was at the time a going concern, whether actually insolvent or. not in the sense that it had assets insufficient to pay its debts.

2. The doctrine that the corporate assets of a corporation constitute a trust fund for the payment of its debts is confined to the case of a corporation which is either insolvent or has suspended business, and whose assets have gone into the possession of a court of equity,·in a proper proceeding for that purpose, to be administered for final settlement and distribution, and does not prevent. the disposition of its property in good faith by a corporation while it is a going concern, and is not contemplating a cessation of business or a winding up of its affairs, whether in fact insolvent or not.

3. A director may loan money to his corporation, and, while the latter is solvent, it may give a mortgage to the director to secure the money so loaned, and the fact that the corporation becomes insolvent afterwards will not impair the validity of such security.

4. A corporation acting in good faith and without any purpose of defrauding its creditors, but with the sole· object of continuing a business which promises to be successful, may give a mortgage to directors who have lent their credit to it in order to induce a continuance of that credit, and in order to obtain renewals of the corporation paper at a time when 'the corporation, although it may not be in fact possessed of assets equal in cash prices to its indebtedness, is in fact a going concern, and intends and expects to continue in business. ·

5. Although by the statute regulating general assignments for the benefit of creditors, a debtor is declared to be insolvent within the meaning of that statute, and therefore entitled to make such an assignment, when he is unable to pay his debts from his own means as they become due, that condition does not alone constitute insolvency in the case of a corporation within the meaning of any rule not controlled by statute affecting the power to secure or prefer in good faith particular creditors while continuing a going concern.

6. As popularly and generally understood, "insolvency" denotes the insufficiency of the assets of a debtor to pay his debts in full, and that is the sense in which the term is usually applied when the question is presented whether a corporation was or was not solvent at the time it executed a mortgage to secure a debt.

7. A corporation organized to conduct a mercantile business purchased its original stock of goods and fixtures for $3300, assuming as a part of the purchase price a mortgage of $1300 and paid the balance with borrowed money, a director with a mere nominal interest in the company indorsing the note for the borrowed money and the note given to renew the mortgage debt. The property so purchased was worth more than the amount paid for it. Additions were made to the stock, and from time to time the said notes were renewed with said director's endorsement, and eventually mortgages were executed on the company's stock of goods and store fixtures to secure them, and when they became due the director aforesaid advanced the money to pay the same, taking the company's note and mortgage for the amount. The company was a going concern and did not contemplate a cessation of business at the time the mortgages were executed, but continued business, paying bills for merchandise from time to time and other debts until about three months after the mortgage last mentioned was given, when the mortgagee took possession of the mortgaged property. *Held*, upon the evidence, that the company was not insolvent when it commenced business, nor when the mortgages were given; that the mortgages were made in good faith to secure *bona fide* debts of the company; that there was nothing indicative of fraud in the director's conduct, and that the mortgages were not fraudulent as against general creditors.

8. Where a corporation purchased a stock of goods, assuming as a part of the purchase price the payment of a debt secured by chattel mortgage on the property purchased, and such debt was renewed from time to time, but the mortgage was not kept alive by renewal affidavits so as to remain valid against subsequent purchasers or mortgagees in good faith or creditors. *Held,* that as the company had not only actual knowledge of the mortgage, but had assumed the mortgage debt, it was not a purchaser in good faith so as to enable it to avoid the mortgage for the absence of a renewal affidavit; and the fact that the company had substituted its own note for that of the original debtor would not change the situation. *Held,* further, that such fact was entitled to consideration in determining the validity as against creditors of a subsequent mortgage given to a director to secure money advanced by him to pay such debt; the said director having indorsed the company's first note therefor and the renewal notes.

[Decided March 7, 1911.]                (113 Pac., 791.)

ERROR to the District Court, Natrona County, HON. CHARLES E. CARPENTER, Judge.

The material facts are stated in the opinion.

*John B. Barnes, Jr.,* and *J. R. Sullivan,* (*M. C. Brown* of counsel) for plaintiff in error.

It was error for the court to admit, over objection, testimony tending to show that Tobin, the mortgagee and intervener, was not a stockholder and director of the defendant company. Two shares of stock were issued to him and he testified that he was told that he would be given two shares of stock. For him to deny that he was a member and director of the corporation would be and ought to be considered as an admission of his intent to launch the corporation by evading the law. He dealt with the company as a corporation and is now prevented from questioning its legal existence. And yet if he was neither a stockholder nor director, the company would not have had a legal existence, for it required him as a stockholder and director to complete the number of incorporators and directors required by law. He signed the articles of incorporation and is therefore

precluded from denying that he subscribed for and received stock in the company or that he was an officer thereof at the time of its incorporation. If he was a stockholder and director at the time the company was incorporated and for the first year thereafter, he necessarily remained so, since the company had only two other members.

The court erred in finding generally for Tobin and in giving his mortgage preference over the claims of the plaintiffs and the other creditors. As he was a director of the company, the latter could not legally prefer him. A few courts have applied the doctrine that an insolvent corporation may prefer creditors without distinction, but the great weight of authority is against such rule. The majority of the courts hold that directors of an insolvent corporation have no power to prefer themselves. (5 Thompson on Corporations, 2nd Ed., 1018, 1019, 1021; Hays v. Bank (Kan.), 33 Pac., 318; Adams v. Printing Co., 27 Ill. App., 313; Shields v. Hobart, 172 Mo., 491; Stratton v. Allen, 16 N. J. Eq., 229; 198 Pa. St., 446; 75 Fed., 554; 53 Neb., 670; 36 Neb., 548; 42 Neb., 740; 45 Neb., 549; 175 Ill., 89; 130 Ill., 162; 78 Miss., 179; 74 Miss., 290; 136 U. S., 237.) It is true that many cases hold that an insolvent corporation may give its directors preference over other creditors, although few of such cases harmonize with each other. Some base their opinion upon the condition that the preference be to secure or satisfy a pre-existing debt. Some allow a preference if it is not to secure a pre-existing debt. Some hold the preference valid where the director loaned his credit to the company or advanced money to it to prevent others from forcing it into the hands of a receiver. Some uphold the preference if made after the company was known to be insolvent, so that diligent creditors had·equal opportunity with the directors to protect themselves. But all of the courts agree that the preference must have been made in good faith. (Oil Co. v. Marbury (U. S.), 23 L. Ed., 328; Corey v. Wadsworth, 118 Ala., 488; Thomp. on Corp., 2nd Ed., pages 1024-1025; State v. Rubber Co., 149 Mo., 181; Henderson v. Trust Co., 143

Ind., 561; Canning Co. v. Reid, 159 Ind., 614; Bank v. Woolen Mills Co., 163 Ind., 214.)

In this corporation no one put up any money unless it was Tobin, and he had only two shares of the stock and claims that he took no part in the affairs of the company. Before the company was organized he had a mortgage on what later became the goods of the company. When the goods were to be bought he suggested the forming of a company. He did not wish to assume the debt personally and so had the company formed; but by endorsing the notes he took the stock and everything that the company had in the way of assets. He kept himself informed as to the condition of the company, as Rogers testified, as it was his duty to do, and when he learned that the company was failing he secured himself by taking the mortgages. It cannot be doubted that he was the chief agent in the incorporation of the drug company, and that he organized it for the purpose of getting in his possession and under his control everything material in the way of assets to satisfy his own claim in utter disregard of the claims of many *bona fide* creditors. He has assumed the many conflicting and confusing positions in connection with the company and its business for the purpose of defrauding the creditors. The corporation was a fraudulent undertaking from its inception. As a director Tobin was bound to know its financial condition. (21 Ency. L., 2nd Ed., 896, 34 Fed., 124; 5 Neb., 527; 54 O. St., 549.) His acceptance of the office is presumed. (21 Ency. L., 845.) And although elected for a specified term, a director holds until he resigns, quits the concern by disposing of his holdings, or his successor is elected. (21 Ency. L., 849, and cases cited; 2 Thomp. on Corp., Sec. 1441.) This director assisted the others of the company in concealing its true financial condition by carrying his claim without security from May, 1906, to January, 1908, thus allowing others to deal with it upon the honest belief that the stock was unencumbered and that the corporation had been organized honestly.

*Norton & Hagens,* for defendant in error, Stephen Tobin.

The appellate court will not disturb a judgment based on conflicting evidence unless it is wholly unsupported by or clearly contrary to the evidence in the case. This proposition is well settled by many decisions of this court. The mere fact that Tobin was named in the articles of incorporation as a director for the first year and that he appears as a stockholder in the books of the company does not estop him to deny that he was a director afterwards, nor the character of his ownership of the stock so as to make him liable as such. A person who receives stock from a corporation as a gratuity cannot be held an actual stockholder, and the liabilities of an actual stockholder do not attach to him. (Christensen v. Eno, 106 N. Y., 97, 60 Am. Rep., 429.) The law does not presume that one who is named in the certificate of incorporation as a director for the first year is a stockholder, for the obvious reason that there can be no stockholders before the certificate is signed and filed. (Furniture Co. v. Opera Co., 11 Wyo., 128.) Nor is there any presumption of law that a person named as a director for the first year holds over after the expiration of his term so as to make him liable as such. (10 Cyc., 740; Bank v. Faber, 56 N. Y. Supp., 542.) The law requiring a director to be a stockholder means a real and not a sham stockholder. He must be the actual beneficial owner, not merely the ostensible owner. (10 Cyc, 737, 740.) The strongest interpretation that can be given section 3979, Comp. Stat., is that if directors continue to act after their term of office has expired and before successors are elected, the corporation is not in a position to object. Although it appears that Tobin was elected a director by the two remaining members of the company, it also appears that he was not present at that meeting, that he was not notified of such election, and that he never accepted the office in express terms and never acted in the capacity of a director. He was therefore not a director in fact. (Cameron v. Seaman, 69 N. Y., 396.) It is not contended that the by-laws of the company attempted to reduce the number

of the directors, but only to vest the authority in the hands of two directors. Tobin was merely a nominal party in the company. The corporation was not dissolved by the loss of one of its directors, for the remaining directors had the power to fill the vacant position. (10 Cyc. 1277.) It is clear, therefore, that without Tobin as a director or stockholder the company might have had a legal existence.

Though a corporation be insolvent, yet if the directors believe it to be solvent they may lend money to it and take security, and are not bound to know that it is insolvent. (Cook on Corp., p. 2124; Converse v. Sharp, 56 N. E., 69.) It has been repeatedly held by this court that a party cannot complain of error unless it is to his detriment, and that where a ruling is erroneous but it does not appear that prejudice resulted to the complaining party, the error, if any, does not give ground for complaint. (Gregory v. Morris, 1 Wyo., 213; Jenkins v. Cheyenne, 1 Wyo., 281; Fein v. Davis, 2 Wyo., 118; Davis v. Lumber Co., 14 Wyo., 517.)

The plaintiff in error is not in position to attack the Tobin mortgage. The proceedings by which he seeks to set aside the mortgage is in the nature of a suit in equity or a creditor's bill in which a large number of unsecured creditors have attempted to join. It is not pretended that plaintiff had a judgment when suit was commenced, nor at any time since, nor that any of the other creditors, except three or four, had any judgment when they were permitted to intervene, and none of them ever had an execution issued. A creditor's bill must be preceded by a judgment at law, and cannot be maintained before an attempt to collect the judgment by the issue of execution. (Jones v. Green, 1 Wall. 320; Alder v. Fenton, 24 How. 407; Day v. Washburn, 24 How. 353; Taylor v. Bowker, 11 U. S. 110; Tube Works Co. v. Ballou, 146 U. S. 517, 523; Bank v. Dwight, 47 N. W. 111; Cates v. Allen, 149 U. S. 451; Scott v. Neely, 140 U. S. 106; Fein v. Fein, 3 Wyo. 164.) The Tobin mortgage was declared by the order of Oct. 8, 1908, to be a first and prior lien and mortgage upon the property

of the company. That order has never been set aside, nor does it appear in the record that any attempt was made to set it aside.

There is no preponderance of the evidence, much less is the evidence conclusive, that the defendant company was insolvent on June 1, 1908, when the mortgage was given. A great many of the accounts introduced in evidence show that part of the obligation thereof, if they can be considered as evidence at all, was incurred before June 1, 1908, and prior to Jan. 24, 1908, and payments were made on many of them at various dates up to the time of the foreclosure. Some of the obligations appear also to be the personal obligations of Rogers rather than the company, inasmuch as they appear to have been paid by him personally and not by the company. We believe that a candid examination of the record will show that when the mortgage to Tobin and Sullivan was made, which secured something over $5000, the assets of the company amounted to over $6000.

The unpaid subscriptions for stock are part of the corporate assets in determining its solvency. (Heinz v. Van Dusen (Wis.), 70 N. W. 675.) The company was in embarrassed circumstances June 1, 1908, but was continuing to do business, was a going concern, and was believed to be able to survive if tided over till fall by the advances made by Tobin. That being the case, the securities given for such advances are valid and enforcible, even though the company was insolvent at the time, and though Tobin was a *bona fide* director and stockholder. This proposition is abundantly supported by the authorities, even where the so-called trust fund doctrine obtains. It is apparent that Tobin honestly believed that if the company was permitted to continue in business all its obligations would be paid. Instead of foreclosing the mortgage of January at once, as he might have done, he paid off the indebtedness and took two notes, secured by a new mortgage in his own favor. Under the statute the mortgage was not fraudulent against creditors. (Sanford Fork and Tool Co. v. Howe, 157 U. S. 312.) The assets of a corporation do not constitute a trust fund

for the benefit of creditors in such a sense that any dispo-
sition thereof to secure an antecedent indebtedness in favor
of one of its officers, while the corporation is still a going
concern and expects to continue the business, may be set
aside at the instance of creditors. (Childs v. Carlstein &
Co., 76 Fed. 86; Hollins v. Iron Co., 150 U. S. 371; Ry.
Co. v. Ham, 114 U. S. 587; Fogg v. Blair, 133 U. S. 534;
Bank v. Lumber Co., 90 Mich. 345; Kendall v. Bishop, 76
Mich. 634; Oil Co. v. Marbury, 91 U. S. 587; Gould v.
Ry. Co., 52 Fed. 680; Smith v. Skeery, 47 Conn. 47; Hop-
son v. Aetna Axle Co., 50 Conn. 597.) These authorities
and others sustain the proposition that directors and officers
of a financially embarrassed, though going corporation, act-
ing in good faith and for the apparent benefit of the corpor-
ation, may loan it money, taking security for its repayment,
and may enforce payment from such insolvent corporation
in preference to its general creditors. And renewal judg-
ment notes given by a corporation subsequent to insolvency
are as effective as preference as the original judgment notes
given prior to insolvency. (Ill. Steel Co. v. O'Donnell,
156 Ill. 624; Richardson v. Green, 133 U. S. 30; Converse
v. Sharp, 56 N. E. 69; Bank v. Ward, 111 Fed. 782; Oil
Co. v. Marbury, *supra;* Foster v. M. P. M. Co., 16 Minn.
150; Kraft-Holmes G. Co. v. Crow, 36 Mo. App. 288;
Blair v. Steel Co., 42 N. E. 895; Henderson v. Trust Co.,
40 N. E. 516.)

The so-called "trust fund doctrine" has been repudiated
by the weight of authority and the best considered cases.
The later tendency of American courts has been to repudiate
or limit the doctrine and to hold that a company may be
insolvent but may secure a *bona fide* and subsisting obliga-
tion. (Corey v. Wadsworth, 25 So. 503; Gould v. Ry. Co.,
52 Fed. 680; Gerritt v. Plow Co. (Ia.), 29 N. W. 396;
Jewelry Co. v. Volfer, 17 So. 525; Hollins v. Iron Co.,
150 U. S. 371; Hospes v. Car Co., 50 N. W. 1117; Bank
v. Lumber Co. (Mich.), 69 N. W. 735; Keeney v. Converse
(Mich.), 58 N. W. 325; Schufeldt v. Smith (Mo.), 31
S. W. 1039; Foster v. Mill Co. (Mo.), 4 S. W. 260;

Worthem v. Griffith (Ark.), 28 S. W. 296; Wells Fargo & Co. v. Scott (Utah), 55 Pac. 81; Levering v. Bimel (Ind.), 45 N. E. 775; Hill v. Nisbet, 100 Ind. 341; 64 Ind. 406; 70 Ind. 309; 52 Ind. 468; 21 N. E. 907; 26 N. E. 884; Brown v. Furniture Co., 58 Fed. 286; Butler v. Harrison L. & M. Co., 139 Mo. 467; Wilson v. Stevens (Ala.), 29 So. 678; Crymble v. Mulvaney (Colo.), 40 Pac. 499; Burchinell v. Bennett (Colo.), 52 Pac. 51; Ragland v. McFall, 137 Ill. 81; Off v. Jack, 204 Ill. 79; Whitewell v. Warner, 20 Vt. 425; Duncomb v. R. R. Co., 84 N. Y. 190; Conway v. Smith Merc. Co., 6 Wyo. 468.)·

There is nothing peculiar or strange about the management or organization of this company nor in the dealings of Tobin with it. The company was simply an ordinary everyday business corporation. Tobin was sponsor for the company from the time of its organization. He made it possible for these unsecured creditors to sell their goods and realize large profits thereon until a short time prior to the foreclosure proceedings, while he patiently waited for his money in the belief that the company was honestly devoting its money to merchandise and increasing its business, getting the benefit of discounting bills, &c., and finally, when the largest creditor demanded his money and threatened to foreclose his mortgage, Tobin further assisted the company by advancing the money necessary to pay that obligation. It cannot be doubted that if his belief at the time he took the mortgage had been realized, the creditors as well as himself would have been benefited by the transaction. He exercised the utmost good faith in that and in all his transactions with the company, and should be allowed to realize upon his mortgage.

POTTER, JUSTICE.

The Harle-Haas Drug Company brought an action in the District Court against the Rogers Drug Company, a corporation, to recover a judgment for money alleged to be due on an account for goods sold and delivered. In that action a receiver was appointed of the property and

effects of the defendant company on the motion of the
plaintiff, with the consent of Stephen Tobin, who, on the
same day that the action was commenced, had taken pos-
session, under a chattel mortgage previously executed in his
favor, of the stock of goods and store fixtures of the de-
fendant, the same comprising substantially all of the prop-
erty and assets of the defendant, with the exception of its
book accounts.  The order appointing the receiver recited
that it was not to affect and was made without prejudice
to the Tobin mortgage, and provided that all other creditors
of the defendant should have the right to intervene and
establish their respective claims by proper suits or actions
and thereby become entitled to share in the proceeds real-
ized by the receiver after the payment of the prior incum-
brances.  By proceedings subsequently taken in the action
the plaintiff and several intervening creditors, without, how-
ever, first establishing the validity and justness of their
claims, assailed the right of Tobin to be preferred under
his mortgage, on the ground that he was a stockholder and
director of the company, that the mortgage was executed
when the company was insolvent, and was therefore void
for the purpose of giving a preference over general credi-
tors.  Thereupon an issue was joined between the plaintiff
and Tobin upon the intervening petition of the latter pray-
ing that his mortgage be declared a prior lien upon the
property covered by it, resulting in a judgment sustaining
the validity and priority of the mortgage for the full amount
secured, *viz.*, $3,441, with interest.  Complaining of that
judgment the plaintiff brings the case here on error, naming
the original defendant and Tobin, the intervenor, as defend-
ants in error.  No other creditor is named or appears as a
party or otherwise in this court.

The original defendant was incorporated in May, 1906,
as the Osborne-Rogers Drug Company, and its name was
changed to the Rogers Drug Company in July, 1907, upon
the retirement of Osborne from the concern.  The incor-
porators were Robert L. Osborne, Ira H. Rogers, and
Stephen Tobin, who were also named in the certificate of

incorporation as the directors for the first year. The company was organized with Osborne as president, Tobin as vice president, and Rogers as secretary and treasurer. Subsequently, as above stated, Osborne withdrew from the company, his interest being purchased. by Rogers, who thereupon became president and treasurer, and his wife, Effie C. Rogers, became secretary, the shares formerly held by Osborne being re-issued in her name. Nothing was paid in at any time upon the authorized capital stock of $5,000, but the fifty shares, of one hundred dollars each, were all issued; Osborne and Rogers each originally receiving twenty-four shares, and two shares being issued in the name of Tobin. There is a conflict in the evidence as to whether the latter actually accepted or received the shares issued to him. However, he continued to be named as a director with his knowledge, and attended the first or organization meeting and the one held in July, 1907, for the purpose of changing the corporate name, and although it appears that he did not attend any other meeting, we are inclined to consider the case from the standpoint that he was a director, qualified, however, by the other facts and circumstances showing his actual relation to the company and its business, so far as the same may properly be regarded as affecting his rights respecting the financial operations with which he was connected. We perceive nothing in the evidence to justify the assertion of counsel for plaintiff in error that Tobin was the only person beneficially concerned in the corporation, or that it was a scheme of his for the purpose of deriving some unfair pecuniary advantage to himself. It is clear upon the evidence that he was regarded by all the parties connected with the corporation as merely a nominal member of it; that he signed the certificate of incorporation and allowed himself to be named as a director at the request of Osborne and Rogers in order that the statute requiring at least three incorporators and three directors might be complied with, and to enable Osborne and Rogers to engage in a corporate capacity in the business then contemplated by them. It is

true that he had agreed to give them the aid of his indorse-
ment to raise the capital required to start their proposed
enterprise, and that, as will presently be shown, he did so;
but it does not appear, nor is there any indication to that
effect in the record, that for the assistance so extended by
him he was to receive any unusual consideration or ad-
vantage. The two shares of stock issued to him were not
paid for by anyone, and it appears from the testimony
of Rogers, who was a witness on behalf of the plaintiff,
that but one share would have been issued to Tobin, if
by doing so, an equal number of shares would have re-
mained for each of the other incorporators. Stephen Tobin
did not in fact assume any part in the actual management
of the business of the company, nor was he employed in
any capacity in its conduct.

Immediately following its incorporation the company en-
gaged in the retail drug business, carrying in stock besides
drugs and druggists' sundries, such articles of merchandise
as clocks, watches, jewelry, silverware, glass and chinaware,
notions, tobacco and cigars. Its only actual capital was
$2,000, borrowed from one Patrick Sullivan upon the com-
pany notes indorsed by Tobin, and that money was used
in the purchase by the company from one E. F. Seaver
of an established business, with stock of goods and store
fixtures in the town of Casper, in this state. At that time
the property so purchased was incumbered by a chattel
mortgage executed in July, 1905, by Seaver to Tobin, to
secure the payment to the latter or his assigns of several
promissory notes aggregating $2,000, of which debt there
remained unpaid the sum of $1,300. Whether Tobin held
the unpaid notes at the time of the purchase, or had placed
them in the Casper National Bank with his indorsement is
not made definite by the evidence, but it seems probable that
they were held by the bank. The purchase price of the
property was $3,300, as a part of which the company as-
sumed to pay the above mentioned mortgage debt, and the
company note for the amount indorsed by Tobin was given
to the bank above mentioned to replace the outstanding

mortgage notes. The mortgage was not released, nor was a new mortgage given at that time.

Subsequently, on January 24, 1908, the company executed a chattel mortgage covering its entire stock of goods and store fixtures to Patrick Sullivan and Stephen Tobin, to secure the payment of its two notes of the same date, payable May 14, 1908, for $2,141 and $1,300, respectively, the former made to Sullivan and the latter to Tobin. The note to Sullivan was a renewal of the note held by him, and represented his original loan to the company, with some lately accrued interest; and the note to Tobin was for money then advanced by him to pay the note aforesaid at the bank for the same amount, upon which he had been liable as indorser. Tobin continued his personal liability for the debt to Sullivan by indorsing the new note. The notes thus given and secured were not paid by the company at maturity except probably the interest thereon, but on June 1, 1908, Sullivan not wishing to longer carry his note, the same was paid with money advanced for that purpose by Tobin, and the latter took from the company new notes payable to himself for $2,141 and $1,300, respectively, due October 1, 1908, and a new mortgage to secure the same; and that is the mortgage here involved. Tobin testified that he took the new mortgage, and thus extended further credit to the company, believing it to be solvent, and unable to pay these debts at the time as the result of slow collections caused by local conditions affecting the chief productive interest of the locality, and that if these secured debts were not then enforced, the concern would be able to successfully continue business. There is evidence that the company, at that time, as well as in January preceding, was behind with some current bills; but, notwithstanding a general statement to the contrary in the testimony of Rogers, the trial court would have been justified upon the evidence in finding that the condition of the company in that particular was unknown to either of the mortgagees. However, it is not shown that any general creditor was taking steps to enforce immediate payment. The contrary

is indicated by the evidence. Indeed, a clerk in the store of the company, who had loaned it $1,000, and was paid the amount after the mortgage of June first was given, testifying on behalf of plaintiff, said that he did not know that the company was insolvent until it ceased doing business September 25, 1908, nor that it was even in a failing condition until about September 1, 1908.

Mr. Tobin does not appear to have acted or advised as a director in the matter of the giving of the mortgages. He was not present at the meeting at which either mortgage was authorized. He made no representation to any creditor, nor does it appear that credit for any existing claim was extended to the company in reliance upon his official connection with it. The company seems to have conducted business without exceptional difficulty and with a fair measure of success until at least about the time the first mortgage was executed, and thereafter and until after the giving of the mortgage here in question there seems to have been no appearance of change in that respect. The stock of goods had been much increased, the fixtures had been substantially improved, and until June 1, 1908, the date of the mortgage in question, the stock was well kept up. Payments were made in the course of business upon bills for merchandise during the winter, spring and summer months of 1908, it appearing that between March 1 and June 1, the expenditures for that purpose amounted to more than $2,700; and after June 1, the company paid about $1,500 upon its general indebtedness, the latter sum including $1,000 paid to one Hadley, the clerk above referred to, for money previously borrowed. It also appears that the cash sales in the regular course of business from January 1, 1908, to June 1, 1908, averaged about $1,200 per month; such sales during the month of May amounting to $1,023.75. We think the clear effect of the evidence is that when the mortgages were respectively executed a suspension of business was not contemplated. We have, therefore, to consider a mortgage given by a corporation which was at the time a going concern, whether actually insolvent or not

in the sense that it had assets insufficient to pay its debts.

On September 25, 1908, Tobin took possession under his mortgage, and on the same day the plaintiff commenced its action, and shortly thereafter the receiver was appointed, who disposed of the property under the orders of the court. The contest in this proceeding therefore relates to the proceeds of the mortgaged property realized by the receiver. Both mortgages above mentioned were signed in the name of the Rogers Drug Company by Ira H. Rogers, as president, and were also signed by Effie C. Rogers, as secretary.

It is contended that the mortgage was executed by an insolvent corporation to one of its directors, and was therefore void as to other creditors. The "trust fund" doctrine is invoked in support of that contention. We deem it unnecessary to enter upon a discussion historically of that doctrine. It was at no time uniformly accepted by the courts, and the result of later decisions has been to establish certain important limitations upon its application. By the better and we think the weight of authority the proposition that the corporate assets of a corporation constitute a trust fund for the payment of its debts is confined to the case of a corporation which is either insolvent or has suspended business, and whose assets have gone into the possession of a court of equity, in a proper proceeding for that purpose, to be administered for final settlement and distribution; and this repudiates the theory that while a corporation is a going concern, without contemplating a cessation of business or a winding up of its affairs, whether in fact insolvent or not, a trust attaches to its property preventing the disposition thereof in good faith. (Thompson on Corporations, 6th Ed., secs. 3418, 3421,) In section 3421 of the work cited, the author says:

"In the final analysis the only reasonable rule resting on a sound basis, and the only impregnable fortress in which the trust fund doctrine is safe from judicial assault, is that the capital stock or assets of a corporation are a trust fund for the benefit of the corporate creditors when the corporation has either suspended business or has become insolvent,

and its assets have been placed in the possession of a court of equity and in the course of administration for final settlement and distribution."

The Supreme Court of the United States, in the leading case of Hollins v. Brierfield &c. Co., 150 U. S. 371, say:

"Becoming insolvent, the equitable interest of the stockholders in the property, together with their conditional liability to the creditors, places the property in a condition of trust, first for the creditors, and then for the stockholders. Whatever of trust there is arises from the peculiar and diverse equitable rights of the stockholders as against the corporation in its property, and their conditional liability to its creditors. It is rather a trust in the administration of the assets after possession by a court of equity, than a trust attached to the property, as such, for the direct benefit of either stockholder or creditor." Referring to the proposition as somewhat analogous to the case of a corporation that an equitable lien and trust exists to some extent in the case of partnership property, the court further say: "Yet all that is meant by such expressions is the existence of an equitable right which will be enforced whenever a court of equity, at the instance of a proper party and in a proper proceeding, has taken possession of the assets. It is never understood that there is a specific lien or a direct trust." And again: "As between itself and its creditors the corporation is simply a debtor, and does not hold its property in trust, or subject to a lien in their favor, in any other sense than does an individual debtor. * * * Neither the insolvency of the corporation, nor the execution of an illegal trust deed, nor the failure to collect in full all stock subscriptions, nor, altogether, gave to these simple contract creditors any lien upon the property of the corporation, nor charged any direct trust thereon."

Citing that case and others, it was said by Adams, Circuit Judge, in Am. Exch. Nat. Bank v. Ward, 111 Fed 782, expressing the view of the Eighth Circuit Court of Appeals, that "notwithstanding a contrariety of opinion on the subject, it is now, we think, established by persuasive and con-

trolling authority that the insolvency of a corporation does not *ipso facto* transform its assets into a trust fund for the equal benefit of its creditors." And it was there held that "such being the law" an insolvent corporation may, in the exercise of its *jus disponendi* prefer one creditor to another.

In Tennessee the trust fund doctrine with much of its original strictness is adhered to, it being the settled law in that state that the assets of an insolvent corporation become, from the date of its assured insolvency, a fixed trust fund for equal *pro rata* distribution among its creditors, unless otherwise provided by law, or fixed by valid contract. Yet in that state it is said:

"Although the liabilities of a corporation may greatly exceed its assets, it is not insolvent in such sense as that its assets become a trust fund for *pro rata* distribution among its creditors, so long as it continues to be a going concern, and conducts its business in the ordinary way. There must be some positive act of insolvency, such as the filing of a bill to administer its assets, or the making of a general assignment, or the permanent cessation to do business." And, further: "We do not decide, and do not wish to be so understood, that a corporation, although actually insolvent, so long as it is a going concern, may not deal with its property and transfer it for value in due course of business, to general creditors. A mere excess of liabilities over assets would not alone be sufficient to justify an interference and stoppage of business at the suit of a creditor." (Tradesman Pub. Co. v. Car Wheel Co., 95 Tenn. 634.)

The trust fund doctrine was alluded to in the case of Conway *et al.* v. Smith Merc. Co., 6 Wyo. 468, as follows: "It is urged that the assets of a corporation in failing circumstances constitute a trust fund for the benefit of all creditors alike, and that no arrangement resulting in any preference of a part of the creditors over others will be allowed to stand. Judge Thompson takes this view in his commentaries on the Law of Corporations. The great weight

of authority is against him. The question has been discussed until it is threadbare, and another discussion here would be unprofitable." And in that case preferences in favor of certain general creditors by an instrument conveying all the property of the insolvent corporation at the time of or immediately preceding its suspension of business was upheld as valid.

In the later case of Durlacher v. Fraser, 8 Wyo. 58, it was said that the American courts, following Wood v. Dummer, 3 Mason, 311, have usually held that the capital of a corporation is a trust fund for the payment of its debts; and that some courts have objected to that statement of the law, but that "it is uniformly held that a corporation cannot give away its property or transfer it unless in good faith for value if its creditors would be left unsecured thereby." The question involved in that case was not whether an insolvent corporation could prefer or secure one of its own creditors, but whether a mortgage was valid which was given by the corporation to secure the personal obligation of its chief stockholder, for which the corporation was not primarily liable.

In the work on Corporations above cited the author again says, with reference to the right of a corporation to prefer a creditor: "It is very generally conceded that a corporation, though in fact insolvent and without sufficient assets to pay its debts, but is still engaged in business and carrying on its corporate enterprises, may under such circumstances secure or prefer a particular creditor. And it may be noted that some jurisdictions that are still stuck to the trust fund doctrine concede this power to an insolvent corporation where it is a going concern." (Thomp. on Corp., sec. 6179.)

There is a greater conflict among the authorities upon the question of the right of an insolvent corporation to secure or prefer a creditor who is at the time one of its directors, or a debt which has been indorsed or guaranteed by a director. There can be no doubt that a director may loan money to his corporation, and that while the latter is sol-

vent it may give a mortgage to the director to secure the money so loaned; and the fact that the corporation becomes insolvent afterwards will not impair the validity of such security. When, however, the corporation has become insolvent, there is a difference of opinion concerning its right to pay or secure a pre-existing debt due a director in preference to debts due others. There is much respectable authority upholding that right generally in the absence of any element of fraud or bad faith. Text writers seem to agree, and it may be conceded, that the weight of authority is the other way. But the rule thus established is subject to important qualifications or exceptions. The principle is well settled that "a corporation acting in good faith and without any purpose of defrauding its creditors, but with the sole object of continuing a business which promises to be successful, may give a mortgage to directors who have lent their credit to it in order to induce a continuance of that credit, and in order to obtain renewals of the corporation paper at a time when the corporation, although it may not be in fact possessed of assets equal in cash prices to its indebtedness, is in fact a going concern, and is intending and is expecting to continue in business." (Cook on Corporations, 6th Ed., sec. 692.) Quoting again from Thompson on Corporations: "It must be noted that the cases make a very clear distinction between the fact of securing a director for money loaned or advanced to the corporation, and the fact of giving the director a preference by way of security for any claim that he may have against the corporation. There is no reason why even an insolvent corporation in need of funds and ready cash may not borrow the amount needed from a director or other officer of the corporation and secure him by a lien on its property or a transfer of its assets." (Sec. 6200.) And in 10 Cyc., at page 1261, it is said: "The inability of a corporation to deal with its property when insolvent or in contemplation of insolvency, for the purpose of preferring particular creditors, whether this inability is imposed by judicial decision or by statute, does not extend so far as to prevent a corporation,

even when insolvent, from making in good faith transfers or mortgages of its property to secure personal advances of money to be used in paying its debts, in extricating itself from its difficulties, or otherwise in continuing its business; and this is none the less so where the mortgage is made to an officer of the corporation."

It is generally stated with reference to a security given to a director, whether the strict or liberal rule be adopted, that such transactions will be closely scrutinized by a court of equity, and to be sustained, the proof must be satisfactory that the transaction was entered into in good faith. (Richardson's Ex'r. v. Green, 133 U. S. 30; Brown v. Furniture Co., 58 Fed. 286; Gould v. Railway Co., 52 Fed. 680.) In New Memphis Gas Light Co. cases, 105 Tenn. 268, it appeared that a corporation in embarrassed financial circumstances, but, endeavoring to extricate itself from its difficulties and to continue its business, executed a trust deed to secure certain bonds, upon which certain of its directors were liable as accommodation indorsers. One of such directors obtained his release as an indorser by paying a part of the note, whereupon pledged bonds equaling the amount paid were transferred and delivered to him, and the company subsequently executed to him a new note for the amount secured by a pledge of an equal amount of the bonds so issued as collateral. That director, with others who were likewise indorsers upon company paper and had paid the same, taking over to themselves the pledged bonds, purchased the property of the company upon a foreclosure under the trust deed. The transaction was upheld as legal and not a fraud upon creditors. The court say:

"It is well settled that a director is not forbidden by reason of his position, from dealing with the corporation, and it often serves a wise purpose that he should lend it his personal credit in carrying on its operations. This being so, why should he not be permitted, from a going concern, continuing and expecting to continue business, to secure indemnity against possible loss from accomodation loans he has made for it. * * * * It is true all such transac-

tions will invite the closest investigation by the courts, if brought in question, and must be shown to be characterized by the utmost good faith, but when found to be free from all suspicion of unfairness they will be maintained. There are cases to the contrary, but we think the weight of authority, as well as considerations of policy, sustain such a transaction."

In Sanford Tool Co. v. Howe &c. Co., 157 U. S. 312, it appeared that certain directors had loaned their credit to the corporation by indorsing its notes when it was a going concern, and later, its business still continuing, a trust deed was executed by the company to indemnify them for their indorsements, or renewals thereof, or for moneys thereafter advanved by them. Relying on that security such indorsers paid or procured renewals of the notes, and some of them subsequently paid other paper obligations of the company. When the trust deed was executed, as well as at the time of the indorsements aforesaid, the company was in full operation as a going concern, with ample means to pay its indebtedness if the cash cost of its property could be obtained therefor. It is said in the case that the directors accepted the indemnity mortgage in good faith, with knowledge that all the money obtained by means of the notes upon which they had become liable as indorsers, had been properly appropriated to and gone into the property and material of the company. The company was indebted at the time in the sum of $275,000. The value of its property at that time is not stated, but it was appraised in the receivership proceedings at less than $205,000. In the opinion by Mr. Justice Brewer, the court say: ·

"The mortgage was not given simply as security for a past indebtedness, but to induce the indorsers to obtain for the corporation a renewal or extension of its obligations, and to make further indorsements. In reliance upon this mortgage the indorsers secured renewals or extensions, or themselves took up the notes they had indorsed, and at the same time lent the credit of their names to new paper of the company. Thus they prevented a suspension of the

business and enabled the corporation to continue its opera-
tions, and did so believing that by such continuance the
corporation would be enabled to work itself out of its tem-
porary difficulties.    All this was done in the utmost good
faith.    Under these circumstances, should the transaction
be condemned and the mortgage be held void as against
creditors?    This question, we think, must be answered in
the negative."  *   *   *   *   "Will it be doubted that, if
this mortgage had been given directly to the holders of these
notes, it would have been valid?    Are creditors, who are
neither stockholders nor directors, but strangers to a corpo-
ration, disabled from taking security from the corporation
by reason of the fact that upon the paper they hold there
is also the indorsement of certain of the directors or stock-
holders?    Must, as a matter of law, such creditors be con-
tent to share equally with the other creditors of the corpo-
ration, bescause, forsooth, they have also the guarantee of
some of the directors or stockholders, whose guarantee may
or may not be worth anything?    But even that is not this case,
for here the corporation was a going concern and intending to
continue in business, and the mortgage was given with a
view of enabling it to so continue, and to prevent creditors
whose debts were maturing, from invoking the aid of the
courts to put a stop thereto.    Can it be that, if at any given
time in the history of a corporation engaged in business,
the market value of its property is in fact less than the
amount of its indebtedness, the directors, no matter what
they believe as to such value, or what their expectations
as to the success of the business, act at their own peril in
taking to themselves indemnity for the further use of their
credit in behalf of the corporation?    Is it a duty resting
upon them to immediately stop business and close up the
affairs of the corporation?    Surely, a doctrine like that
would stand in the way of the development of almost any
new enterprise."  *   *   *   *   "Again, not only was the
corporation a going concern, not only did the directors
expect and intend that it should continue, and believe that
its continuance would bring financial success, but, as ap-

pears, they did continue the business for two months, and
during that time paid out in the ordinary management of its
affairs and in discharge of its debts over $30,000, without
appropriating a single dollar to the payment of the claims
for the indorsement of which they had taken this indemnity.
We are of the opinion that these facts · clearly and fully
distinguish this. case from many which have been cited,
in which the action of the directors of a corporation in se-
curing to themselves preferences in the hour of its extrem-
ities has been adjudged void, and that it is going too far to
hold that a corporation may not give a mortgage to its di-
rectors who have lent their credit to it, to induce a contin-
uance of the loan of that credit, and obtain renewals of
maturing paper at a time when the corporation, though not ·
in fact possessed of assets equal to its indebtedness, is a
going concern, and is intending and expecting to continue
in business." (See also Rockford Grocery Co. v. Grocery
Co., 175 Ill. 89; Webster v. Ypsilanti Canning Co., 149
Mich. 489.)

The denial of the right of directors of an insolvent cor-
poration to obtain a preference by way of security or pay-
ment of debts due them by the corporation, is not as a rule
founded upon the trust fund doctrine, but upon the theory
that it is inequitable that a director, whose position as to
knowledge of conditions and power to act for the corpora-
tion gives him an advantage, should be permitted to pro-
tect his own claim to the detriment of others, at a time
when it is apparent that all the unsecured debts of the
corporation are equally in peril, and that all of them cannot
be paid. The courts sustaining that rule regard the director
as in a sense trustee for all the stockholders and creditors,
so far at least as to render it improper for him to act solely
for himself, in disregard of the interest of those for whom
he is such trustee. As might be expected, many cases have
arisen which are held to be otuside the rule even where it
is strictly maintained, because not within its reason, and
where, if the rule were enforced, gross injustice would re-
sult. In Nebraska, where the general rule forbidding

preferences in favor of directors obtains, it was held that where a director, who had made a loan to the corporation and was entitled to a note therefor, died and his son, upon being appointed administrator of the estate, also became a director of the company and applied for and received from the company as administrator a note in the amount of the loan previously made, that a judgment upon such note recovered after the corporation became insolvent should be allowed priority. The court say: "There was nothing shown from which it can be asserted that any advantage was taken of the position as director to gain any advantage of preference, and this being true, the judgment must be allowed to have the place in priority which it would ordinarily have." (Nebraska Nat. Bank v. Clark, 58 Neb. 183.)

In Wisconsin it is held that insolvency of a corporation is absolutely essential to the application of the rule, and that unless insolvency is established the directors may in good faith pay a *bona fide* indebtedness to themselves, or may secure such indebtedness by a mortgage upon the corporate property or otherwise. And the condition of insolvency which will avoid a preference or security in favor of the director is explained as follows: "It is when a corporation ceases to be a going institution, or its business is in such shape that its directors know, or ought to know, that suspension is impending, that its assets in the hands of such directors become, by equitable conversion, a trust fund for the benefit of its general creditors, so that, if such directors prefer themselves over such general creditors, such action constitutes a fraud in law, and equity will compel them to make restitution of all property thereby diverted to their personal benefit to the prejudice of such creditors." (Hinz v. Van Dusen, 95 Wis. 503.) In that case, because of the absence of a finding or evidence showing insolvency, a chattel mortgage was sustained which was given partly for the purpose of paying the claims of two directors for money previously loaned to the corporation, leaving unpaid a debt upon which another director was liable as indorser. The

chattel mortgage there in question seems to have been given upon all of the tangible property of the corporation, and the only additional assets referred to in the opinion were liabilities of certain stockholders for the unpaid portion of their stock.

In Cowan v. Plate Glass Co., 184 Pa. St. 1, it appeared that one of the directors, who was also treasurer of the corporation, advanced money to it upon the promise that there would be delivered to him the company notes with the power of attorney to confess judgment. And after the advances were made such a note was executed and delivered. With reference to his right to such preference the court say: "This was a financially embarrassed corporation in straits for ready money; the directors believed it might survive these difficulties if it obtained a comparatively small amount for its then present necessities; it is doubtful if it could have obtained the money from any lender, banker or individual, on better terms, or on other security. The object was not to benefit Kann (the director), but the corporation and all others interested in its success. The security was given two months before the appointment of a receiver. From the circumstances, it is altogether reasonable to suppose that, while the parties knew the company was heavily in debt, neither of them believed it was insolvent. We discover no semblance of unfairness or collusion, or an intent to prejudice other creditors in the transaction."

In Mueller v. Fire Clay Co., 183 Pa. St. 450, it appeared that arrangements were made by the corporation there involved whereby notes of the corporation held by certain banks and indorsed by some of the directors were secured. The directors had been indorsers upon the notes for some time, and the lender was exacting further security from the company, with the implied threat that otherwise they would refuse to renew the notes but would proceed to obtain judgment unless security was given, and the promise that they would continue to renew the paper if the demand was complied with. The court said that the evidence established the fact that the corporate property was purchased

subject to a debt which the company assumed; that money was borrowed on the company notes with the four directors as indorsers, and applied in part payment of this debt. "This was in direct aid of the corporation, at the very commencement of its business; the directors received not a cent of compensation for assuming a liability for the benefit of all the stockholders, or for continuing that liability when the banks demanded better security from the company. * * * * Why should the legality of the bank's security be affected by the fact, that incidentially the indorsers were relieved from a liability which they had assumed for the benefit of the company? The result of the contention of the appellees is that the judgment should be vacated and the banks be turned over to suit against the indorsers, and that the indorsers should be compelled to contribute to other stockholders and creditors for the privilege of loaning their credit to the company." And the court added that if there had ever been a time when a rule was enforced that would have permitted such injustice, in later years the rule has been relaxed so as to accord with the growing necessities of the business world; and that the true interpretation of the rule, as shown by the weight of authority, is that the burden is on the officers' having both the power and preference to show that the contract was fair under all the circumstances. Concluding, the court say: "Even if the company was insolvent, and the directors knew it, at the date the judgment (security) was given, under the facts proven, the conclusion that the judgment was therefore fraudulent and void, is erroneous, because not in accord with the settled law." (See also Law v. Fuller, 217 Pa. St. 439; Sabin v. Columbia River &c. Co., (Ore.) 34 Pac. 692, 35 Pac. 854.)

In line with the explanation of the rule in the cases above cited, it is observed in Thompson on Corporations, that the cases very generally agree that a corporation is not insolvent within the meaning of the rule which prevents a preference to directors merely because it cannot meet its obligations as they become due, or for the reason that its assets are not

equal to, or would not if sold pay all its liabilities, where it is still a going concern, "that is, continuing its business with some expectation and a reasonable prospect of being able to continue the corporate enterprise." (Sec. 6176.)

Returning now to the case before us, the question is whether the mortgage was given under such circumstances as to render it fraudulent in law or in fact, and therefore invalid. And we are of the opinion that it was not. This conclusion is reached not only upon a consideration of the nature of the obligation secured and the occasion and purpose of the security, but as well upon the facts disclosed by the record concerning the financial condition and expectations of the company at the time the lien was created.

In the first place the evidence fails to establesh the insolvency of the company in January, 1908, when the debts covered by the mortgage were first secured. Although by the statute regulating general assignments for the benefit of creditors, a debtor is declared to be insolvent within the meaning of that statute, and, therefore, entitled to make such an assignment, when he is unable to pay his debts from his own means as they become due (Comp. Stat. 1910, sec. 3366), that condition does not alone constitute insolvency in the case of a corporation within the meaning of any rule not controlled by statute affecting the power to secure or prefer in good faith particular creditors, while continuing a going concern. As popularly and generally understood, "insolvency" denotes the insufficiency of the assets of a debtor to pay his debts in full. (22 Cyc. 1256; 16 Ency. L., 2nd Ed. 637; Jones on Insolv. Corp., sec 7.) And this is the sense in which the term is usually applied with relation to the question here presented. (Jones Insolv. Corp., sec. 9; Mining Co. v. Smelting Co., 119 N. C. 415; Sabin v Columbia &c. Co., (Ore.) 34 Pac. 692; Hinz v. Van Dusen, 95 Wis. 503; Corey v. Wadsworth, 99 Ala. 68; Thompson on Corp., sec. 6176.)

From an inventory dated and shown to have been actually taken February 10, 1908, it appears that the assets of the company at that time consisted of a stock of goods includ-

ing fixtures of the value of $7820.40, the stock being valued at cost price with freight added; good accounts, $1000; doubtful accounts, $180; making the total value of $9000. The inventory was itemized, but there was omitted in many instances, especially as to the items of drugs, a statement of the quantity, and L. P. Hadley, a clerk who assisted in making the inventory, testified in effect that in such cases, including the goods in the cellar and warehouse respectively, the value was estimated, and on that account he stated as his opinion that the value of the goods was in fact about fifteen per cent. less than that shown by the inventory. The fixtures were valued in the inventory at $1000, and that value is amply supported by other evidence. The record presents no reason for questioning the item of good accounts. There is some question whether there should be included in the assets two items in the inventory, viz: a safe valued at $216, and a cash register valued at $250, which had been sold to the company conditionally and upon which respectively only part of the purchase price had been paid. It does appear, however, that another safe belonged to the company worth $50, which was not mentioned in the inventory. If the value placed on the stock be reduced 15 per cent. it would amount to $5797.34. Adding the value of the fixtures and the good accounts the total value of the assets at the time stated would appear to be $7797.34. Even if this should be reduced so as to embrace only the reasonable value of the interest of the company in the safe and cash register, we think $7500 would not be an unfair estimate in favor of the company, or the intervenor Tobin, of the value of the company's assets when the inventory was made, and this would give credit to every objection urged against such inventory. Ernest Marsh, a salesman for plaintiff who frequently visited defendant's place of business, testified that exclusive of jewelry &c., his judgment of the value of the stock and fixtures in January and until June, 1908, was about $4500. The jewelry stock was inventoried at about $1600, which, added to the estimate made by the witness of the drug

stock would make $6100. And it is doubtful if his estimate included the china and silver-ware. The trial court would have been justified in disregarding his valuation of the fixtures as much too low, in view of the other evidence on that subject. The inventory of the jewelry stock appears to have been properly taken in all respects and the jeweler employed by the company testified that he assisted in making the inventory, and the jewelry stock was correctly inventoried and valued. For the purposes of this case, therefore, the trial court having made no special findings on the subject, we shall take the value of the company's available assets to have been at least $7500 in January, 1908, and June 1, 1908, when the mortgages were respectively executed, there appearing nothing to indicate that the value was less at either of those times than when the inventory aforesaid was taken.

Ira H. Rogers, in his deposition, testified generally that the liabilities of the company in January and on June 1, 1908, including the secured debts, amounted to about $6500. It was attempted on the trial to show the liabilities at that time by the introduction of verified claims which had been filed with and allowed by the receiver. The amount thus shown, including an overdraft at the bank of $111, was $1983.58, considering only the items of the various claims which had been incurred prior to the date of the mortgage. With the debts due the mortgagees, the total amount of liabilities thus appearing was $5424.58. The claim of plaintiff in error, alleged in its original petition to amount to $765.73, is not included in this computation, for the reason that the record furnishes no information as to when it was incurred. Near the conclusion of the transcript of the evidence the court is reported as stating that the plaintiff's account is admitted to be just, true and correct, and an existing indebtedness as scheduled by the receiver. But the claim does not appear in the list of claims presented and allowed contained in the receiver's report found in the record before us, and we find nothing in the entire record to show an indebtedness to plaintiff at the time of the execu-

tion of either of the mortgages.   Upon the evidence, therefore, the assets of the company exceeded its liabilities to the extent of at least $1000 in January, 1908.   We have not examined the various claims or the items thereof with particular reference to the amount of the liabilities existing on June 1; 1908, deeming that unnecessary in view of the fact that the mortgage of that date was a substitute for the one executed in January and given to secure the same debts.

It was argued that this company was insolvent from the time it commenced business.   But although it is true that nothing was paid in upon the capital stock and that the business was commenced upon borrowed capital exclusively, it is also true that the money borrowed was used in the purchase of the original stock of goods and fixtures, and it appears by the uncontradicted testimony of Mr. Seaver, from whom the property was purchased, that the same was worth more than the amount paid therefor.   At the time of commencing business, therefore, the company was indebted in the sum of $3300, represented by its notes to Sullivan indorsed by Tobin for $2000, and its note to the bank likewise indorsed for $1300, and its assets consisted of the property purchased aforesaid having a value in excess of such indebtedness.   It is evident that it was contemplated by all the parties that the corporate enterprise would be a success.   Hence it cannot be correctly said that a condition of insolvency then existed.   In addition to the assets above mentioned there was available at all times the unpaid stock subscriptions, or the amounts for which the several stockholders were liable upon their acceptance of the stock issued to them respectively, which might have been enforced through proper assessments and proceedings, the value thereof of course depending upon the financial condition of the individual stockholders.   With the exception of the two shares issued in the name of Stephen Tobin, who may or may not have accepted them, there is nothing in this record to show whether any assessment would have been collectible.

One of the obligations secured represented the debt assumed by the company as part of the purchase price of its

original stock of goods and store fixtures, and the other
was for money procured by loan to pay the remainder of
the purchase price, and it was so used.   Nothing outside
of interest had been paid upon these obligations.   Tobin
had taken up the note at the bank, on which he was liable
as an accomodation indorser, and was again called upon to
indorse the notes held by Sullivan, if they were to be re-
newed.   Proceedings to enforce the collection of these obli-
gations would no doubt have compelled a suspension of the
business of the company, not only to its own detriment, but
to the disadvantage of all the creditors, notwithstanding
that its assets exceeded its liabilities at that time.   That
result was avoided by the execution of the mortgage in
January, and again by the mortgage given in June; and
thus the company was enabled to continue in business, and
there was a reasonable expectation that it would and could
so continue.   As stated in an earlier part of this opinion,
the business was in fact continued the same as before with-
out interruption for the period of about eight months; and
several of the general creditors received at least partial
payments of their claims during that time.

Although a director, Stephen Tobin was so only in name,
that is, he had the slightest beneficial interest, if any, in the
concern, that interest, if any, being such as arose from his
ownership of two shares of stock; and he did not at any time,
as a director, officer or stockholder, act or advise with
reference to any financial or business transaction on behalf
of the company.   The reason for his official connection
with the company has been stated.   The debts thus secured
were unquestionably *bona fide* debts of the company, in-
curred in good faith, and there appears to be nothing indica-
tive of fraud in the conduct of Mr. Tobin relative to them.

The fact is also entitled to consideration that the $1300
note represented the debt which the company had assumed
as part of the purchase price of its original stock of goods,
and that at the time of such purchase that debt was secured
by a chattel mortgage upon the property.   That mortgage
was given in July, 1905, and the last installment of the debt

secured became due April 10, 1906.   It would have remained valid even as against creditors, without renewal, for the period of sixty days after the term for which it had been given, which period did not expire until after the company purchased the property.   Nothing is shown to have been said at the time with reference to the mortgage; but, whether the notes continued to be held by Tobin or had been indorsed to the bank, it remained a valid lien for the unpaid portion of the debt secured as against the company, who had assumed the obligation of the original debtor, even without renewal.   Under the statute a chattel mortgage ceases to be valid, where notice of foreclosure is not given or a renewal affidavit filed within the period aforesaid, only as against subsequent purchasers or mortgages in good faith, or creditors.   (Comp. Stat. 1910, sec 3733.)   Having not only actual notice of the mortgage, but having assumed the mortgage debt, the company was not a purchaser in good faith within the meaning of the statute, so as to enable it to avoid the mortgage for the absence of a renewal affidavit. (Schnavely v. Bishop, (Kan.) 55 Pac. 667; Mendenhall v. Kratz, (Wash.) 44 Pac. 872; Cassiday v. Harrelson, (Colo.) 29 Pac. 525; Nix v Wiswell, 84 Wis. 334; Corbin v. Kincaid, (Kan.) 7 Pac. 145.)   We doubt that the fact that the company substituted its own note for that of the original debtor would change the situation.   It appears that this mortgage had not been releaseed.   If it be conceded that, without a renewal affidavit, it had ceased to be valid as against creditors, the company, being in a condition to enable it to make a valid mortgage, might well have deemed itself under an obligation to secure the payment of the debt to Tobin.

For the reasons above explained, we are of the opinion that the validity of the mortgage held by Stephen Tobin, under which he took possession of the property, was properly sustained, and, therefore, the judgment will be affirmed.                ·           *Affirmed.*

Beard, C. J., and Scott, J., concur.